# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1164 rel. to 04 C 1427 | **DATE** | 5/28/2004 |
| **CASE TITLE** | Marseilles Hydro Power LLC, vs. Marseilles Land and Water Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The Court hereby denies to MLWC's Motion for Summary Judgment as to Count IV of its Counterclaim and grants MHP Summary Judgment on that issue; grants MHP's Motion for Summary Judgment as to MHP's Issues 1 and 3; partially grants and partially denies MHP's Motion for Summary Judgment as to Issues 2 and 4; and as the allegations made in Count III of MLW's Counterclaim stand entirely inconsistent with the Court's declarations as to MHP's Issues 1 and 3, the Court sua sponte Grants MHP summary judgment on that claim.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | JUN 1 - 2004 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | 147 |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| WAP | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

FILED JUN 1 - 2004

MAY 28 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

JUN 1 - 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARSEILLES HYDRO POWER LLC,

        Plaintiff,

    v.

MARSEILLES LAND AND WATER
COMPANY,

        Defendant.

Case No. 00 C 1164

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

In 2000, Plaintiff Marseilles Hydro Power ("MHP") filed suit against Defendant Marseilles Land and Water Company ("MLWC," or "Water Power Company") seeking declaratory and injunctive relief with respect to two agreements for water rights between the parties, known as the 1910 and 1924 Indentures (together, "Indentures"). Following a long litigation history, including a remand from the Seventh Circuit and MLWC's filing of counterclaims, this case has again reached the summary judgment stage. MLWC and MHP both seek summary judgment concerning Count IV of MLWC's Counterclaim. MHP also asks the Court, via summary judgment, to make four declarations as a matter of law. Specifically, MHP requests that the Court find that: (1) MHP is the holder of all rights, title and interests of the Second Party under the Indentures; (2) MHP is entitled to receive and use all the water power producible by the North Head race at Marseilles, Illinois, excepting therefrom only that water power allocated to others under

147

written leases still in effect that predate June 1, 1910; (3) MHP validly extended the Indentures until October 15, 2090; and (4) MHP shall pay for the water power taken under the Indentures according to § 9 of the 1924 Indenture.

For the following reasons herein, the Court hereby denies to MLWC's Motion for Summary Judgment as to Count IV of its Counterclaim and grants MHP Summary Judgment on that issue; grants MHP's Motion for Summary Judgment as to MHP's Issues 1 and 3; partially grants and partially denies MHP's Motion for Summary Judgment as to Issues 2 and 4; and as the allegations made in Count III of MLWC's Counterclaim stand entirely inconsistent with the Court's declarations as to MHP's Issues 1 and 3, the Court *sua sponte* Grants MHP summary judgment on that claim.

## I. **FACTUAL BACKGROUND**

In 1867, the Illinois State legislature formed MLWC. The charter vested in MLWC the responsibility of leasing water power generated by diverting the Illinois River via a dam, through canals constructed by MLWC, to businesses along these canals. Among these canals is the North Race canal, extending around a dam in a crescent shape for approximately 2,800 feet.

In 1910, MLWC entered into a ninety (90) year lease with H. Eugene Chubbuck ("Chubback"), who owned a power plant and land adjoining the canal, for rights to portion of the water flowing through the canal. By 1924, certain disputes arose between MLWC and the Light Corporation a/k/a Illinois Power ("LC"), the

successor in interest to Chubbuck.  MLWC and LC resolved this
dispute by entering into a 1924 Indenture intended to clarify the
1910 lease.

Section 12 of the 1910 lease contained the following clause:

> Any act or thing which shall have the effect
> in law to change the right of possession in
> said premises as an entirety from one party to
> another shall operate as an assignment of this
> indenture to the party lawfully entitled to
> such possession.

Thus, according to the 1910 "lease," (as detailed below,
although the Court occasionally uses the term "lease" for purposes
of convenience, it does not technically find that the Indentures
constitute "leases") any attempt by Chubback to transfer possession
his power plant, or the land under it, would require him similarly
to convey the leases to the new possessor.  Section 28 of the 1924
Indenture modified this clause as follows:

> ASSIGNMENT OF WATER LEASES: It is mutually
> understood and agreed that the rights of the
> Light Corporation in the use of water granted
> in its said leases shall not be separated from
> the right of possession of the premises
> occupied by its hydroelectric plant or plants.
> Any act or thing which shall have the effect
> in law to change the right of possession of
> said premises from the Light Corporation to
> another shall operate as an assignment of this
> indenture, and all of the water leases of the
> Light Corporation, to the party lawfully
> entitled to such possession; but the Water
> Power Company shall, in the event the Light
> Corporation transfers the right to the
> possession of said premises to another,
> separate and apart from the use of the water
> granted in said leases, have the option to
> cancel this indenture and the said water
> leases by notifying the Light Corporation, its

> successors or assigns, in writing of its
> election so to do.

On February 2, 1999, LC sold its interest in the hydroelectric plant to Midwest Hydro, Inc. ("MH"). On August 13, 1999, LC transferred its interest in the water leases to MH. On March 20, 2000, MH transferred ownership of the plant to Marseilles Hydro Power, LLC ("MHP"). On May 19, 2000, MH similarly transferred its interests in the water leases to MHP. Due to a scribe's error, the transfer document erroneously stated that the leases were transferred to Midwest Hydro Power (to this Court's knowledge, a nonexistent company) instead of Marseilles Hydro Power. In any event, during 1999 and 2000, the possession of the "premises" and the interests in the leases got briefly separated not once, but twice, in apparent violation of the 1910 and 1924 contracts.

The 1910 agreement (and the subsequent 1924 Indenture) provided for the "Second Party" (Chubback and his successors in interest) the option to renew the lease for another ninety years before the lease's conclusion. In October 2000, MHP exercised this option.

Although MHP, as the purported "Second Party," elected to extend the lease another ninety years, significant disputes existed between it and MLWC. In 1988, LC shut down its hydroelectric power plant, although it continued - after some complications - to pay its required rent. Around the same time that LC closed its power plant, MLWC ceased maintaining the canal. By 1998 or 1999, the

- 4 -

canal had fallen into significant disrepair. Much like the water within the dilapidated canal, rental payments stopped flowing to MLWC during fiscal year 1999 (which ended October 15, 2000). During fiscal 1999, LP, MH, and MHP combined paid only $15,000. Since then, MHP has withheld rent, citing the condition of the canal.

In 2000, MHP began the process of seeking to reopen the power plant. To acquire the necessary permits and licenses, MHP felt that it needed the canal in working order. Since MLWC refused to repair the canal, MHP filed suit in federal court seeking declaratory relief that MLWC was in violation of its obligations under the Indenture, and injunctive relief entitling it to enter onto MLWC's property to enact repairs. On April 27, 2000, MHP filed for a temporary restraining order seeking permission to repair the canal due to its imminent collapse. On appeal, the Seventh Circuit remanded the case back to the District Court on the grounds that Judge Conlon improperly denied MLWC's request for a jury trial. In addition, the Seventh Circuit recommended that the District Court stay the case pending resolution of related claims before the Federal Energy Regulatory Commission ("FERC").

Meanwhile, in July 2001, MLWC filed a notice with the Recorder of Deeds of LaSalle County stating that it was terminating the water leases. MLWC based its termination on alleged breaches of "specific conditions and covenants of the aforementioned Water

Power Leases." This filing led to Count III of MHP's second amended complaint, which charged MLWC with "slander of title."

Upon remand to the District Court, the case was reassigned to these chambers. After MHP filed an amended complaint and MLWC responded with a motion to dismiss, this Court stayed Count II (calling for injunctive relief) pending resolution of the FERC proceedings. The Court also partially dismissed the newly added Count III. In March 2003, MLWC filed its counterclaim. Counts I and II of the counterclaim allege that MHP committed trespass and negligence by entering onto MLWC's property to enact unauthorized repairs on the canal. Count III seeks a declaratory judgment that the leases were terminated in 2000 because the May 2000 lease transfer entrusted the lease rights to Midwest Hydro Power. Ergo, Marseilles Hydro Power had no authority to renew the leases in October 2000. Lastly, Count IV, pled in the alternative to Count III, seeks money damages for MHP's failure to pay rent under the contract.

## II. DISCUSSION

### A. Is MHP the "Second Party" Under the 1910 and 1924 Indentures?

#### 1. Did the 1999 and 2000 transfers of power plant ownership automatically transfer the interest in the Indentures, or constitute a breach of § 28 authorizing MLWC to cancel the water leases?

To have standing to sue, MHP must demonstrate that it has rights and duties owed to it under the 1910 and 1924 Indentures. In

its motion for summary judgment, MLWC argues that MHP cannot establish such standing under two different theories. First, MLWC argues that the May 2000 contract illegally separated the ownership of the premises and the interests in the Indentures by assigning the latter to "Midwest Hydro Power." This argument is easily disposed of as MHP contends, and MLWC does not refute, that the reference to "Midwest Hydro Power" constitutes a mere typographical error with no legal or factual significance. Worthy of more serious consideration is MLWC's second theory: that the 1999 and 2000 brief separations of power plant ownership and interest in the Indentures constituted a breach of § 28 of the 1924 Indenture.

As noted in the factual record, § 28 contains two seemingly contradictory clauses. Initially, § 28 states that:

> It is mutually understood and agreed that the rights of the Light Corporation in the use of water granted in its said leases shall not be separated from the right of possession of the premises occupied by its hydroelectric plant or plants. Any act or thing which shall have the effect in law to change the right of possession of said premises from the Light Corporation to another shall operate as an assignment of this indenture, and all of the water leases of the Light Corporation, to the party lawfully entitled to such possession

Read on its face, this provision appears to act like a covenant running with the land - making it legally impossible to separate possession of the power plant premises from interest in the leases. Under this interpretation, any effort to separate the

two would prove nil, as the leases would automatically transfer to the new possessor of the power plant.

The above provision however is flatly contradicted by the remainder of § 28, which states:

> . . . but the Water Power Company [*i.e.*, MLWP] shall, in the event the Light Corporation transfers the right to the possession of said premises to another, separate and apart from the use of the water granted in said leases, have the option to cancel this indenture and the said water leases by notifying the Light Corporation, its successors or assigns, in writing of its election so to do.

Read together, the Indenture seemingly creates a legal Catch-22: MLWP has the right to cancel if the right to possession is ever transferred separate from the water rights, but any such situation is impossible, as the transfer of possession would automatically transfer with it the water rights. This, indeed, is the interpretation MHP advances. However, such a contractual reading renders the second half of § 28 utterly meaningless. In doing so, this interpretation conflicts with the well-settled Illinois rule of contract construction that "all provisions are presumed to have been inserted for a purpose, and that a contract should be interpreted to give meaning and effect to each provision contained therein." *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 640 N.E.2d 1359, 1366 (Ill. App. Ct. 1994). Therefore, the Court must look for a way to harmonize the conflicting terms.

The Court begins by rejecting the approach of viewing § 28 as akin to a covenant running with the land. Illinois courts will

enforce agreements as covenants running with the land only if: (1) the parties so intended; (2) the covenant touches and concerns the land; and (3) there is privity of estate between the parties. *U.S. Fidelity and Guar. Co. v. Old Orchard*, 672 N.E.2d 876, 884 (Ill. App. Ct. 1996). A covenant "touches and concerns the land" if it "affects the use, value and enjoyment of the leasehold estate and of the property." *Id.* (internal citations omitted). Illinois law permits leases to qualify as covenants running with the land. *See Nassau Terrace Condominium Assoc. v. Silverstein*, 537 N.E.2d 998, 1001 (Ill. App. Ct. 1989). However, during the legal research this Court conducted, every case construing a lease as a covenant running with the land concerned a lease for the land itself, or the rights to extract minerals contained within it. In either event, the actual *land* was leased. Here, the Indentures lease neither the hydroelectric plant nor the land underneath it. Rather, they simply require the hydroelectric plant possessor to purchase water or pay at least a minimum fee to MLWC. Although this arrangement, if found to bind all subsequent possessors of the power plant premises, affects the value of the land in question, it does not affect the use of the land. Indeed, for the ten years MLWC had ceased operating a hydroelectric plant with no apparent effect on the lease's status. The Indentures therefore do not "touch and concern" the premises of the hydroelectric plant.

The 1999 and 2000 transfers also evidence the failure of the Indentures to function as covenants running with the land. In both

1999 and 2000, the selling and purchasing party contracted separately and apart for the ownership of the premises and the interest in the leases. Had LC or its assignors MH and MHP considered the water leases a covenant running with the land, they would have made no effort separately to distinguish the rights to the premises from the rights to the Indentures. Conversely, these efforts suggested that MHP, along with LC and MH, viewed the premises and Indentures as legally separable. Although this does not constitute the *best* evidence of the parties intent, as Chubback was the original covenantee, it nevertheless is instructive given that MHP now seeks to enforce the Indenture against himself as such a restrictive covenant.

Rather, MHP's conduct during the 2000 transfer agreements suggests that the Court favor the interpretation of MLWC, an original covenantor. Under this rubric, the first portion of § 28 does not mean that it is legally impossible for MLWC, or its assignees, to separate the premise from land. Rather, § 28 obligates the Second Party, by contract, not to cause such a separation. If the Second Party, violates this provision, it stands in breach of its contractual responsibilities. Consequently, MLWC then receives the option to either accept the breach, or intervene and cancel the lease. Unlike MHP's interpretation, this, in the Court's view proper, contractual reading gives meaning to both halves of § 28, logically harmonizing the entire clause. Therefore, the Court finds that both the 1999

and 2000 transfers constituted a breach of the 1924 Indenture, providing MLWC with the right to cancel the water leases.

### 2. *Did MLWC Waive its Right to Terminate the Leases?*

Next the Court turns to MHP's argument that, even if MLWC had a right to terminate the leases, it waived this right by waiting too long to exercise it – while accepting the benefits of the temporary separations and transfers. MHP argues that MLWC knew about the temporary separations no later than July 28, 2000, when its counsel delivered documents to MLWC's counsel evidencing the temporary separation. MLWC acknowledges receiving the documents around that date, but claims that the parties soon after agreed to a discovery stay pending the outcome of settlement negotiations. MLWC submits that it reviewed the documents only after the parties settlement negotiations fell apart, and preventing it from learning of the temporary separations until October 29, 2000. MLWC then argues that an order from Judge Conlon "effectively barred MLWC from conducting any business." MLWC does not specify what part of which judicial order prevented it from terminating the Indentures.

After reviewing both parties' accounts, the Court takes no position on the date when MLWC could be said to "know" of the temporary separations. However, even if the Court accepts MLWC's date of October 29, 2000, MLWC did not attempt to exercise its termination rights until July 17, 2001 – a full eight and a half months after it admittedly learned the separations. During this extensive period of time, MLWC proceeded with litigation –

including going to trial – attempting fully to collect the monthly rents MHP owed to it under the Indentures. Furthermore, after reviewing the case docket, the Court could not find the mysterious purported order from Judge Conlon that "effectively barred" MLWC from terminating the Indentures. The Court therefore agrees with MHP that MLWC waived its right to terminate the Indentures.

### 3. Did MHP materially breach the Indentures in other ways, preventing it from remaining the proper "Second Party"?

MLWC contends that, even if the water leases would otherwise remain valid, MHP forfeited its rights as the Indentures' Second Party in four ways: not paying rent, failing to operate the power plant, unilaterally dewatering the power plant, and failing to abide by the duty of good faith and fair dealing by attempting a hostile takeover of MLWC.

The Court does not find MLWC's arguments persuasive. Under the Indentures, MLWC cannot terminate the water leases for nonpayment of rent until it achieves a final judgment of nonpayment of rent against the Second Party, and the Second Party does not pay that judgment within 90 days. Since MLWC has never achieved such a judgment, it has never had a legal right to terminate the Indentures on that basis. Similarly, MLWC has pointed to nothing in the Indentures that require MHP to operate a power plant. Indeed, at certain points in the Indentures or their amendments, the contract between MLWC and MHP specifically provides for alterations of MHP's obligations in the event that the power plant

- 12 -

is *not* in use.  Additionally, even if this Court were to entertain this frivolous argument that non-operation of the power plant constituted a material breach of the leases, MLWC itself waived this material breach by knowingly accepting rent during 1988 to 1999, an eleven-year period in which the power plant did not operate.  Nor has MLWC pointed to anything in the Indentures that indicates that MHP's dewatering constituted a breach of the contract, instead of arguably a common law tort.  Lastly, there is nothing in the Indentures that preclude MHP from initiating an attempt to takeover MLWC involuntarily.  Accordingly, MLWC has failed to present any material issue that could lead a reasonable fact finder to the conclusion that MHP stands in material breach of the Indentures, authorizing it to cancel them.

The Court therefore declares that MHP remains the Second Party to the 1910 and 1924 Indentures.  As such, it grants MHP summary judgment as to MHP's Issues 1 and 3.

Resolution of Issues 1 and 3, by necessity, impacts the legal standing of Count III of MLWC's Counterclaim.  In its response to MLWC's summary judgment motion concerning Count IV of MLWC's Counterclaim, MHP requests that the Court grant it summary judgment *on both* Counts III and IV.  MHP's request is improper, as it occurs in response *only* to a motion concerning strictly Count IV, and nowhere else.  Nevertheless, the Court cannot permit MLWC to continue to pursue Count III in light of its findings here. Notably, the Court points out that the allegations of Count III are

entirely inconsistent with the Court's declaration here that, as a matter of law, MHP remains the Second Party to the Indentures. Accordingly, the Court *sua sponte* grants Summary Judgement to MHP with respect to Count III of MLWC's Counterclaim.

### B. As Second Party to the Indentures, what rights and obligations does MHP have?

### 1. Does MHP have a right to the use of all water power from the North Head race, except for that allocated to others under leases predating June 1, 1910?

MHP argues that page 4 of the 1910 Indenture gives it the right to all water power generated from the North Head race, except for that allocated to others under written leases still in effect that predate June 1, 1910. This clause gives the Second Party rights to:

> . . . all power obtainable from the water in the North head-race *[sic]* which The Water Power Company now has or may hereafter have that is not already leased or which may, from time to time, be freed from its contract or lease by expiration, cancellation or otherwise.

MLWC responds by noting that § 30 of the 1924 Indenture apparently modifies this provision as follows:

> . . . the Light Corporation shall have the first right to the use of any water released from existing leases with tenants other than the Light Corporation. . . . If the Light Corporation elects to take over such lease and use the water according to the terms and conditions of said lease, then the Water Power Company shall thereupon enter into a new lease with the Light Corporation for the use of said water and the same price and upon the same terms and conditions as are contained in said

> lease; and in case the Light Corporation shall
> not elect to take over such lease and use and
> develop said water then [MLWC] shall have the
> privilege of using or leasing such power.

MLWC argues, and MHP does not contest, that at several times
in the past, leases had expired and that MLWC, as the then-Second
Party, declined to assume these newly available leases. MLWC
claims that, under § 30 of the 1924 Indenture, it has the rights to
any of this water power offered to LC, but declined by LC.

The Court does not see a conflict between the 1910 and 1924
Indentures on this issue. Both effectively speak of water power
"released" or "freed" from expiring leases. The only difference is
that the 1924 Indenture clarifies that, if the Second Party
declines its first rights to the water, MLWC may use it itself, or
lease it to another party.

However, MLWC rights to lease water declined by the Second
Party to another entity does not eliminate MHP's first refusal
riparian rights in perpetuity to this declined water. Rather, if
MLWC leases the declined water to another entity, and *that* lease
subsequently expires, then the water has again been "released from
existing leases." Accordingly, even if MHP declined this water
once previously (allowing it to sign the eventually expiring lease
with another entity), it clearly keeps its first rights to use this
water should the water get released subsequently.

Ergo, the Court finds that MLWC has rights to any water power
except water: (a) allocated to others by virtue of a continuing

- 15 -

pre-June 1, 1910 agreement; or (b) allocated to others by virtue of a post-June 1, 1910 agreement, in which immediately prior to that agreement the water power had first been offered to and rejected by the Second Party. In so doing, it partially grants and partially denies MHP's Motion for Summary Judgment on its second issue.

### 2. *Under the Indentures, what price does MLWC charge MHP?*

Both parties agree that § 9 of the 1924 Indenture sets forth the method of computing rents for the water originally allocated to the Second Party under the Indentures. However, MLWC correctly disputes, that it is unclear at best whether § 9 controls the price for water power originally allocated to parties other than MHP, and only leased to MHP upon expiration of the other leases. In the Court's view, this is especially true given § 30 guidance that, if the Second Party takes over a cancelled lease, it does so "at the same price and upon the same terms and conditions as are contained in said lease." Therefore, while the Court declares that § 9 controls the rent for water power allocated by the Indentures, the question of whether § 9 also controls water power arising from cancelled leases assumed by MLWC remains open.

The Court hereby partially grants and partially denies MHP's Motion for Summary Judgment as to issue 2.

### 3. *Is MHP liable for unpaid rent dating from 1999 till the present?*

MLWC seeks partial summary judgment on Count IV of its Counterclaim. This Count demands that MHP pay the MLWC $26,500 in

minimum and additional rent for 1999, and $41,500 for each fiscal year (October 15 to October 14 of the next year) thereafter. Since this Court has found that MHP remains the Second Party, and validly extended its lease till 2090, this means that MLWC seeks rent up until now. In its response, MHP seeks not only a denial of MLWC's motion, but a grant of summary judgment to it on Counts III and IV of MLWC's Counterclaim.

MLWC argues the Indentures constitute "leases" under Illinois law. As such, MLWC contends that the lessee's covenant to pay rent is independent of the lessor's covenant to repair and maintain property. Therefore, MLWC argues that – even if the Court finds that MLWC breached its obligation to keep the canal in working order – MHP still owes MLWC all the rent prescribed by the water leases. To support its argument, MLWC cites *A.O. Smith Corp. v. Kaufman Grain Co.* 231 Ill. App.3d 390 (Ill. App. Ct. 1992). To avoid paying rent, MLWC claims that MHP must claim and then establish "constructive eviction." Conveniently, an MHP claim for "constructive eviction" would suit MLWC's agenda perfectly, as it has already attempted to cancel the Indentures.

MHP responds that under Illinois contract law, the party that commits the first breach cannot maintain an action for the other party's retaliatory breach, citing *Daniggelis v. Pivan*, 159 Ill. App.3d 1097, 1103 (Ill. App. Ct. 1987). Additionally, MHP argues that the Indentures do not constitute a lease, but rather only a license. Consequently, MHP contends that its covenant to pay rent

depends on MLWC abiding by its covenants to repair and maintain the canal. In this vain, MHP claims that "An instrument that merely gives to another the right to use premises for a specific purpose, the owner of the premises retaining the possession and control of the premises, confers no interest in the land and is not a lease, but a mere license." *In Re Application of Rosewell*, 69 Ill. App. 3d 996, 1002 (Ill. App. Ct. 1979)(internal citation omitted).

The parties have thus presented the Court with three possible ways to construe the water rights granted by the Indentures: a lease, a license, or an ordinary contract. However, none of the cases cited by the parties involve any fact pattern remotely similar to the case at bar. Rather, all but one involve agreements that conferred partial or total interests in land or buildings (the exception was *Daniggelis*, which involved airline discount coupons).

After careful review by this Court, there appears to be *no* direct Illinois law as to whether the right to use water constitutes a lease or a mere license. However, MLWC legitimately analogizes the pending riparian issue to the legal status of hunting rights (as both involve taking something off land, while not directly concerning the land as land), noting that in Illinois the right to hunt on a particular parcel of land qualifies as a lease and not a license. *See Gustin v. Barney*, 250 Ill. App. 209, 214 (Ill. App. Ct. 1924). A review of the laws of other states indicates a strong trend to treat riparian, hunting, or mining rights as leases or quasi leases. One finds that the states of

California, North Carolina, and Pennsylvania qualify these types of agreements as leases. *See San Juan Gold Co. v. San Juan Ridge Mut. Water Assoc.*, 93 P.2d 582, 589 (Ca. App. Ct. 1939)("we are satisfied that this instrument is what it purports to be – a lease"); *J.P. Council, et al. v. W.T. Sanderlin, et al.*, 111 S.E. 365, 367 (N.C. 1922) ("The right to hunt . . . is not a mere license, but is an interest in the real estate in the nature of an incorporeal hereditament."); *St. Helen Shooting Club v. Mogle*, 207 N.W. 915, 917 (Mich. 1926)("the right to hunt . . . is not a mere license, but is an interest in the real estate of an incorporeal hereditament."); *Equitable Gas Co. v. Smith*, 13 Pa. D. & C. 616, 625 (Pa. D&C 1928) ("The agreement . . . is a lease for oil and gas purposes and not a mere license to explore."). Based on the Court's research, Ohio qualifies as the sole exception in treating such agreements strictly as licenses. *See Hubbard v. The City of Toledo*, 21 Ohio St. 379, 399 (Ohio 1871)(regarding water rights, "We think the plaintiffs' lease did not vest in them such claim or right. They had a mere license, which the abandonment extinguished.").

Vermont, unlike other states, flexibly permits parties to structure riparian agreements as they wish. Under Vermont law, "water rights may be conferred in many forms, such as by license, by lease, or by simple contract." *Kelly v. Alpstetten Ass'n*, 303 A.2d 136, 138 (Vt. 1973). Accordingly, Courts interpret what form

a riparian agreement takes not by resort to any hard-and-fast legal rule, but by turning to ordinary contract interpretation principles. *See Bergeron v. Forger*, 214 A.2d 85, 88 (Vt. 1965).

The Court considers this modern approach, enunciated by *Kelly* and *Bergeron,* significantly more equitable than the now-dead law applied by the variety of various state decisions cited above. As noted above, the Court does believe that one could plausibly analogize hunting and/or mining rights to water rights issues. Still, since there remains no Illinois law *directly* on point, the Court elects to reject this analogy in favor of the fairer and far more recent law of Vermont. In so doing, the Court believes that it conforms with Illinois' general contractual principals. Specifically, the Court calls to mind that "a contract should be construed as a whole to give effect to the intention of the parties, and great weight is to be given to the principal, apparent purpose, and intention of the parties at the time that they entered into the contract." *DeWitt County Public Building Comm'n v. County of DeWitt*, 128 Ill.App.3d 11, 18, 83 Ill.Dec. 82, 469 N.E.2d 689, 695 (1984)(internal citations omitted). The Court therefore interprets the Indentures just as it would any contract – in harmony with the principles of Illinois law, and flexibility borrowed from Vermont law.

Given its choice to construe the Indentures as an ordinary contract, the Court finds it totally implausible that either Chubback or the Light Corporation, as the original respective

Second Parties to the 1910 and 1924 Indentures, believed or
intended that the Indentures would require them to continue to pay
their normal minimum rent regardless of whether MLWC maintained the
canal in working order or that MLWC originally believed that the
Indentures required them to so do. The Court notes that MLWC
specifically "covenants and agrees to at all times keep its dam,
pond, head-gates and channels to said leased premises in good
repair and condition and to remove deposits and obstructions."
1910 Indenture, p.5. Furthermore, MLWC agreed that "rent shall at
all times accrue as hereinbefore provided whenever the Water Power
Company is ready to furnish the power, the use of which is herein
leased." 1910 Indenture, p.6. Implicitly, the 1924 Indenture
repeats this agreement when it states that:

> REBATE: The minimum rental shall not be
> reduced because of . . . or because the Water
> Power Company fails to supply the water
> contracted for herein by reason of floods, ice
> or backwater, or because the Water Power
> Company has shut off the water for necessary
> repairs, not exceeding ten (10) days in any
> fiscal year as hereinafter provided. . . .
> When, however, the Water Power Company fails
> for more than ten (10) days in any fiscal year
> to supply the use of the water contracted
> herein due to any cause except floods, ice or
> back water, or shut-downs at the request of
> the Light Corporation, the Light Corporation
> shall be entitled to a rebate in the minimum
> rent as hereinafter provided. . . . The total
> amount of said rebate, computed as aforesaid,
> is to be credited to the Light Corporation in
> the annual settlement next accruing
> thereafter.

1924 Indenture, § 19.

Consequently, the Indentures are crystal clear that the Second Party *does not* have to pay the minimum rent when the canal is not in proper working order for more than ten days per fiscal year. Here, it is undisputed that the canal has not been in working order *at least* since mid-1999 (and possibly as far back as 1988), when MHP ceased paying its minimum rent. It has not been shown however, for purposes of summary judgment, that the canal's disrepair extended back to 1998.

The 1924 Indenture does not provide MHP with the remedy of immediately ceasing its rental payments. However, as shown above, the Indenture does entitle MHP to a "rebate" of rent at the "annual settlement next accruing thereafter," which apparently takes place on January 20 of the next fiscal year. See 1924 Indenture, §§ 18-19. This means that, without having first established the canal's disrepair in the year prior, MHP did not appropriately stop paying rent to MLWC in 1999. However, MHP's failure to pay rent is harmless — as MLWC would have necessarily refunded any and all rent MHP would have paid in 1999. Similarly, under the Indenture, MHP almost certainly needed to pay rent throughout 2000-2003, and MLWC just as clearly needed to refund that rent on January 20 of each successive year.

The current year is no different. The Indenture requires that MHP maintain its rental payments this year, with the right to a possibly full rebate next January. Technically then, the Court could order MHP to pay its obligations for this fiscal year.

However, MLWC has expressed no desire – or ability – to bring the canal up to working order by the close of this fiscal year. Accordingly, it is a near certainty that the canal will remain totally defunct for the entirety of the present fiscal year. Given that, the Court believes it would be silly and pointless to require MHP to pay, or rather loan at 0% interest, its rental payments for this year to MLWC, and then correspondingly require MLWC to refund those payments in full next January. The Indentures, in speaking of a rebate, clearly envisioned partial rebates for temporary disruptions of water power. They did not intend to provide for an absurd situation whereby MHP must pay in full its rent obligations throughout the year, only to receive a full rebate later, year after endless year. Should lightning strike and MLWC miraculously repair the canal to proper working order before the close of this fiscal year, and MHP still refuses to pay rent, MLWC maintains the right to file anew for the portion of the rent owed to it consistent with this opinion.

The Court therefore denies Summary Judgment to MLWC on Count IV of its Counterclaim, and instead grants Summary Judgment to MHP on this claim.

### III. CONCLUSION

The Court grants MHP's Motion for Partial Summary Judgment almost in its entirety. It hereby issues an order declaring that MHP is the holder of all rights, title, and interest of the Second Party under the 1910 and 1924 Indentures. It further declares that

MHP, as the Second Party, properly extended these Indentures until October 15, 2090. MHP's rights under the Indentures include all water power producible by the North Head Race in Marseilles, Illinois, except from water power allocated to others under written leases that predate June 1, 1910 or allocated to written leases that expired between June 1, 1910 and the present day, but which MLWC had previously offered to the Second Party and then rejected by the Second Party, and that MLWC subsequently sold to another party who remains under contract for those water rights. Finally, the Court – for now – only agrees to grant summary judgment on the issue of § 9 controlling the rent for water leased originally under the Indentures, and does not grant summary judgment on whether § 9 also controls the rent on water picked up by MHP from cancelled leases by other parties.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated: _May 28, 2004_

- 24 -